# EXHIBIT 11

ATTORNEY GENERAL OF THE STATE OF NEW YORK

In the Matter of

Endo Health Solutions Inc.
and
Endo Pharmaceuticals Inc.

Assurance No.: 15-228

**ASSURANCE OF DISCONTINUANCE**
**UNDER EXECUTIVE LAW**
**SECTION 63, SUBDIVISION 15**

Pursuant to the provisions of Section 63(12) of the Executive Law and Article 22-A of

the General Business Law, Eric T. Schneiderman, Attorney General of the State of New York,

caused an inquiry to be made into certain business practices of Endo Health Solutions Inc. and

Endo Pharmaceuticals Inc.  Based upon that inquiry, the Office of the Attorney General ("the

OAG") has made the following findings, and Endo has agreed to modify its business practices

and comply with the following provisions of this Assurance of Discontinuance ("Assurance").

## I.    BACKGROUND

1.      Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. (collectively, "Endo,"

or the "Company") are Delaware corporations with their principal place of business at 1400

Atwater Drive, Malvern, PA 19355.  Endo is engaged in the manufacture, marketing and sale of

prescription drugs, in particular the extended-release, long-acting opioid Opana ER, which is a

branded version of the drug oxymorphone.  The U.S. Food and Drug Administration (the

"FDA") approved Opana ER in 2006 for the management of moderate or severe pain when a

continuous, around-the-clock analgesic is needed for an extended period of time ("Original

Opana ER").  In 2012, the FDA approved a reformulated version of Opana ER containing the

1

same active drug but a different formulation ("Reformulated Opana ER"), the purported purpose of which was to make the pill harder to manipulate.[1]

2.      Opana ER is a narcotic painkiller and its label contains "black box" warnings of serious risks from taking the drug, such as addiction and respiratory depression, which can lead to death.

3.      In 2014, Endo had U.S. sales of Opana ER totaling $198 million.

4.      To market Opana ER, among other things, Endo employs sales representatives who visit health care providers ("HCPs"), which include medical doctors, doctors of osteopathy, nurse practitioners, and physicians' assistants.  The Endo sales representatives "detail" HCPs' offices, where they provide informational resources on Opana ER, with the objective of encouraging these HCPs to prescribe Opana ER under appropriate circumstances.

5.      In addition to a yearly salary, Endo's sales representatives may receive a bonus that is based in part on the number of Opana ER prescriptions written by HCPs upon whom they are permitted to call, which can create an incentive to encourage more Opana ER prescribing.

6.      The use of prescription opioids to manage chronic non-cancer pain has increased ten-fold over the past 20 years in the United States, with a concomitant increase in opioid-related health problems.  According to the New York City Department of Health and Mental Hygiene, between 2008 and 2011, the number of opioid painkiller prescriptions filled by New York City residents increased by 31%, from approximately 1.6 million to approximately 2.2 million.

7.      The resulting increase in prescribing of opioids is associated with a sharp increase in the prevalence of opioid addiction, which in turn has been associated with a rise in overdose

---

[1] Endo discontinued Original Opana ER in 2012, but as a result of certain patent litigation settlements, it provided licenses for patents related to Opana ER to certain generic drug manufacturers, some of which subsequently sold generic versions of Opana ER.

deaths and heroin use.[2]  According to the federal Centers for Disease Control and Prevention, in New York State, from 2003 to 2012, deaths involving opioid analgesics increased five-fold, from 179 in 2003 to 883 in 2012.[3]

8.      In May 2011, after a spike in opioid prescribing and abuse, Nassau County issued a Public Health Alert on the increasing abuse of Opana, warning the public and law enforcement of the dangers of Original Opana ER.[4]  The Public Health Alert noted that methods of Original Opana ER abuse included dissolving or removing the coating and then crushing or snorting the pill.  According to the FDA, oral ingestion is the most common route of abuse of prescription opioids, followed by snorting and injection.

9.      In July 2012, USA Today reported that Original Opana ER had become the drug of choice for people seeking narcotics, and that in Nassau County, hundreds of people each month were seeking treatment for addiction to Opana.[5]

## II.   THE OAG'S INVESTIGATIONS AND FINDINGS

10.     In 2013, the OAG commenced an investigation of Endo regarding its marketing of Opana ER, and after obtaining documents and testimony via subpoena, and in this Section II makes the following findings (the "Covered Conduct"):

## A.  Endo's Statements About Opana ER

## i.   The "Crush Resistance" Of Reformulated Opana ER

11.     In 2009 and 2010, Endo conducted a series of studies that assessed whether Reformulated Opana ER was "crush resistant."  One such study ("Study 108") showed that Reformulated Opana ER could be ground with a coffee grinder.  Another study ("Study 109")

---

[2] *See* http://www.annualreviews.org/doi/pdf/10.1146/annurev-publhealth-031914-122957.
[3] *See* http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6414a2.htm.
[4] *See* http://archive.nassaucountyny.gov/agencies/CountyExecutive/NewsRelease/2010/5-9-2011.htm;
http://archive.nassaucountyny.gov/agencies/CountyExecutive/NewsRelease/2010/8-26-2011.htm.
[5] *See* http://usatoday30.usatoday.com/news/nation/story/2012-07-10/opana-painkiller-addiction/56137086/1.

showed that Reformulated Opana ER could be chewed and that chewing "was associated with positive effects indicative of increased abuse potential." To the extent that "crush" means "to press or squeeze [something] so hard that it breaks or loses its shape," or "to break [something] into a powder or very small pieces by pressing, pounding, or grinding it,"[6] some of Endo's studies showed that Reformulated Opana ER can be crushed.

12.     Endo conducted two other studies to test its claims for crush-resistance. In one study ("Study 901"), which assessed whether opioid abusers could convert Reformulated Opana ER into a form amenable to intravenous administration and whether they would be willing to inject the tampered product, two of the hypotheses – that Reformulated Opana ER would be less extractable than Original Opana ER and that it would take less time to extract the drug from Original Opana ER than Reformulated Opana ER – were not met. Both formulations behaved similarly under the study conditions with respect to manipulation time, and produced equivalent yields. Although the Results of Study 901 met the third hypothesis – that a majority of subjects would not want to inject what they extracted after tampering – a similar number of subjects said they would have injected tampered Reformulated Opana ER as would have done so with tampered Original Opana ER. In the other study ("Study 902"), which tested whether subjects could manipulate Reformulated Opana ER into snortable form using various tools, only two of 25 subjects chose to use a coffee grinder, which was a method by which Reformulated Opana ER could be crushed. Twenty-four of the 25 study subjects considered Original Opana ER suitable for snorting after tampering. Three study subjects considered Reformulated Opana ER suitable for snorting after tampering.

---

[6] *See* http://www.merriam-webster.com/dictionary/crush.

4

13.     In January 2011, after reviewing the results of the above-mentioned studies, the FDA concluded that the label for Reformulated Opana ER could not include claims about crush resistance, stating: "[t]he product label should not include language asserting that [Reformulated Opana ER] provides resistance to crushing, because it may provide *a false sense of security* since the product may be chewed and ground for subsequent abuse" (emphasis added).

14.     In October 2011, Endo's Director of Project Management wrote in an email to Grunenthal, the company that developed the formulation technology for Reformulated Opana ER, that

> [w]e already demonstrated that there was little difference between [the original and new formulations of Opana] in Study 108 when both products were ground. FDA deemed that there was no difference and this contributed to their statement that we had not shown an incremental benefit.  The chewing study (109) showed the same thing no real difference which the FDA used to claim no incremental benefit.

15.     Endo executives knew that both Original and Reformulated Opana ER were abused, in particular via intravenous injection.  In July 2012, on the same day that USA Today reported widespread abuse of Opana ER, including in New York, Endo executives developed talking points for sales representatives to use when asked about the article.  In particular, sales representatives were instructed to tell HCPs that

- Endo takes very seriously the problem of prescription drug abuse and is also strongly committed to providing solutions to the medical needs of patients suffering with chronic pain.

- Part of our corporate mission is a commitment to educating physicians and patients about the appropriate and responsible use of pain management therapies.

- Endo discontinued the manufacturing of the original formulation of Opana ER in early 2012 and now only manufactures the new formulation of Opana ER with INTAC technology which is designed to be crush-resistant.

16.     In an internal document that that the OAG obtained via subpoena, Endo's consultant reported to the Company in February 2013, after reviewing national data from substance abuse treatment facilities, that "[t]he initial data presented do not necessarily establish that the reformulated Opana ER is tamper resistant," and that there were reports of higher levels of abuse of Reformulated Opana ER via injection.

17.     Despite the above-stated facts, from May 2012 to May 2013, in pamphlets that its sales representatives distributed to HCPs in New York State, Endo marketed the Reformulated Opana ER as "designed to be" crush resistant.[7]

18.     Moreover, an Endo sales representative testified to OAG that she described Reformulated Opana ER as "crush resistant," without any qualifying language.  In training its sales representatives, Endo identified Reformulated Opana ER as "CR," short for "crush resistant."

19.     In May 2013, the FDA rejected Endo's request to be able to state on the Reformulated Opana ER label that the product is crush-resistant.  Shortly thereafter, Endo ceased marketing Reformulated Opana ER as "designed to be crush resistant."

**ii.    The Addictiveness of Opana**

20.     Until at least April 2012, Endo disseminated to New York HCPs, and stated on its website www.opana.com that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted."  Endo has not conducted nor does it possess a survey that shows that most healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted.

---

[7] In December 2011, the FDA had approved Reformulated Opana ER, based on its bioequivalence to Original Opana ER.

6

21.     In a training script issued in May 2011, Endo instructed its New York sales representatives to give the following response to HCPs who expressed specific concerns about Opana ER. The sales representatives were instructed to ask, "Doctor, are you concerned with abuse potential associated with a long-acting opioid?" If the physician answered "Yes," the representative was instructed to say that Opana ER carries the same abuse liability as other long-acting opioids.

22.     In training materials it provided to its New York sales representatives, Endo stated that "[s]ymptoms of withdrawal do not indicate addiction," when in fact withdrawal is a symptom of opioid-use disorder, a diagnosis under the Diagnostic and Statistical Manual of the American Psychiatric Association (Fifth Edition). Endo's training materials also included assertions that addiction to opioids is not common.

23.     Endo also trained its sales representatives to distinguish addiction from "pseudoaddiction," a purported condition in which patients exhibit drug-seeking behavior that resembles but is not the same as addiction. The "pseudoaddiction" concept has never been empirically validated and in fact has been abandoned by some of its proponents. Endo's Vice President for Pharmacovigilance and Risk Management testified to OAG that he was not aware of any research validating the "pseudoaddiction" concept, and that it would take "a really good clinician" or a behavioral scientist to distinguish between addiction and "pseudoaddiction."

### iii.    Endo's Other Claims

24.     Endo sales representatives testified to OAG that in sales calls to New York HCPs, they distinguished Opana ER from its main competitor, OxyContin, by stating that patients who take Opana ER need less rescue medication (additional, as-needed opioids) than those who take OxyContin. This statement was not supported by any clinical evidence or study.

7

25.     An Endo sales representative also testified to OAG that she was trained to distinguish Opana ER from OxyContin by informing New York HCPs that patients who take Opana ER only need to take it twice a day, whereas those who take OxyContin need to take it three times per day.  This statement was not supported by any clinical evidence or study.

26.     Endo distributed a pamphlet in New York and posted on its public website, www.opana.com, photographs of purported Opana ER patients that implied that patients can achieve higher functioning with Opana ER.  The photos depict individuals with physically demanding jobs (construction worker, chef, and teacher), and portray seemingly healthy, unimpaired people.

**B.   Endo's Statements And Omissions Regarding Opana ER Studies**

27.     Endo did not mention Study 108 or Study 109 in its Reformulated Opana ER "managed care dossier" (the "Dossier"), which it distributed to formulary committees of health plans and pharmacy benefit managers to encourage them to include Reformulated Opana ER in their formularies and, as Endo's Vice President for Pharmacovigilance and Risk Management testified to OAG, is supposed to be a complete compendium of all research on the drug.  Endo did describe certain aspects of the 901 and 902 studies in the Dossier.

28.     Endo briefly summarizes on its public website only some of the studies it has conducted regarding Opana ER.[8]  The Hale Study, which Endo has used extensively in marketing, is described on the website.  However, Study 108 and Study 109, which showed that Reformulated Opana ER can be ground and chewed, are not mentioned on the website.  Further, the website does not mention studies that the FDA concluded failed to show the efficaciousness of Original Opana ER.

---

[8] *See* http://www.endo.com/endopharma/r-d/clinical-research/clinical-trial-study-results.

8

29.     Endo published only certain studies regarding Opana ER, including the Hale Study and Study 901 and Study 902, but it did not publish Study 108 or Study 109.

30.     Endo omitted information about the Hale Study in marketing pamphlets distributed to HCPs. Specifically, although the Hale Study showed that 5.7% of patients who took the drug in the "treatment" phase of the study experienced pain exacerbation,[9] and 6.9% of patients given placebo in that phase experienced opioid withdrawal, Endo omitted these adverse events from marketing pamphlets it distributed to HCPs in New York.

## C.   Endo's Detailing Of Problem Health Care Providers

31.     As described above, Endo knew that Opana was being abused in New York, as early as 2011. Although Endo had issued a written policy requiring detailers to report signs of abuse, diversion and inappropriate prescribing,[10] certain Endo sales representatives who detailed New York HCPs testified that they did not know about any policy or duty to report problematic conduct observed in HCPs' offices, and did not report anyone, even when they saw suspicious behavior.  At the same time, Endo's New York sales representatives received incentive compensation for Opana ER sales, and Endo expanded its HCP target list in January 2012 to include HCPs without experience prescribing long-acting opioids.

---

[9] See Martin E. Hale, et al., *Efficacy and safety of OPANA ER (oxymorphone extended release) for relief of moderate to severe chronic low back pain in opioid-experienced patients: a 12-week, randomized, double-blind, placebo-controlled study*, 8  J. of Pain 175 (2007).
[10] Endo's Code of Conduct provides that if any Endo employee has "any knowledge or suspicion about the improper handling, transfer, loss or diversion of a controlled substance, [that employee must] immediately report it to [their] manager or the [Endo] Ethics Hotline."  All Endo employees are required to certify that they have 'reviewed, read, understand and shall abide by' the Code of Conduct and are subject to discipline, up to and including termination, for violating the Code of Conduct.  Endo's Health Care Compliance Guide states that "[i]f an Endo employee receives a report from an external party regarding suspected diversion of Endo's products or if an Endo employee suspects that diversion is occurring at a customer's site, the employee must report that information" to Endo.  The Health Care Compliance Guide describes signs of potential diversion of which Endo employees should be aware, including (i) prescriptions being paid for in cash; (ii) a large demographic distance between the doctor, patient and pharmacy; (iii) high frequency of prescriptions to replace lost prescriptions or medication; (iv) drugs or doses not being individualized; (v) lack of qualified staff; and (vi) special entrance requirements for patients of the practice. However, there is no indication that Endo's New York sales representatives ever received training in this policy, and certain New York sales representatives testified to OAG that they did not know about such a policy.

32.     Endo detailed certain HCPs who were subsequently arrested and/or convicted for illegal prescribing of opioids in New York State. Endo detailed the following HCPs a total of 326 times, and they collectively wrote 1,370 scripts for Opana ER:

i.    Matthew Bennett: Endo detailed this Buffalo-area physician 61 times between July 16, 2010 and August 8, 2012. He wrote a total of 642 Opana ER prescriptions between July 2009 and July 2012. He was arrested by the U.S. Drug Enforcement Agency on August 10, 2012, for illegal prescribing of opioids, pleaded guilty on April 20, 2015, and was sentenced to three years in prison.

ii.   David Brizer: Endo detailed this Rockland psychiatrist 26 times between March 25, 2011 and August 24, 2012. He wrote a total of 324 Opana ER prescriptions between March 2011 and August 2012. He was arrested by OAG on February 11, 2013, for illegally selling opioid prescriptions, and in February 2014, pleaded guilty.

iii.  Richard Cedeno: Endo detailed this Bronx physician's assistant 19 times between August 17, 2012 and May 22, 2013. He wrote a total of 51 Opana ER prescriptions between August 2008 and May 2013. He was arrested by OAG on June 19, 2013, in connection with illegal prescribing of opioids, and pleaded guilty in 2015.

iv.   Rools Deslouches: Endo detailed this Long Island physician's assistant 7 times between January 13, 2012 and May 17, 2012. He wrote a total of 13 Opana ER prescriptions between February and May 2012. He was arrested by federal agents on June 6, 2012, for illegal distribution of opioids, pleaded guilty, and was sentenced to more than 6 years in prison.

v.    Eric Jacobson: Endo detailed this Queens/Nassau physician 3 times between March 3, 2011 and March 21, 2012. He wrote a total of 22 Opana ER prescriptions in March 2011.

He was charged in June 2011, with conspiracy to distribute opioids illegally, and pleaded guilty.

vi.   Leonard Marchetta: Endo detailed this Staten Island physician's assistant 82 times between January 8, 2009 and July 18, 2013.  He wrote a total of 38 Opana ER prescriptions between April 2009 and April 2013.  On October 27, 2010, a news report identified Marchetta as a supplier for an arrested Staten Island drug dealer.[11]  He was indicted by the United States Attorney for the Southern District of New York in September 2014, for conspiracy to distribute narcotics, pleaded guilty in January 2015, and was sentenced to 11 years in prison.

vii.   Anand Persaud: Endo detailed this Long Island physician 47 times between February 27, 2009 and July 29, 2013.  He wrote a total of 195 Opana ER prescriptions between June 2009 and July 2013.  He was arrested by OAG in July 2013, for illegally selling opioid prescriptions.[12]

viii.   Rohan Wijetilaka: Endo detailed this Westchester cardiologist 79 times from January 16, 2009 and July 18, 2012.  He wrote a total of 85 Opana ER prescriptions between September 2009 and July 2012.  His license was revoked by the New York State Department of Health on June 27, 2012, and he was arrested by the United States Drug Enforcement Administration on July 25, 2012, and charged with illegal distribution of opioids.  He pleaded guilty to health care fraud (giving opioid scripts to patients who allowed him to bill insurers for unnecessary tests) and was sentenced to 3 years in prison.  In testimony to the OAG, an Endo sales representative described Wijetilaka's Yonkers,

---

[11] See http://www.silive.com/eastshore/index.ssf/2010/10/richmond_man_faces_host_of_dru.html.
[12] Endo stopped detailing certain New York HCPs based on concerns of suspected diversion, but, of the HCPs listed in this section, only stopped detailing Marchetta and Persaud after they were arrested.

New York office as follows: "Just very crowded, very crowded offices, very -- people looking to fill their prescriptions, younger demographic.... People looking just for pills as opposed to different offices that would have -- people you could tell who had chronic pain, who had back braces who were older or had different disease states. A lot of these were patients, if I recall, looked like they were looking for meds to get high on." The sales rep never told anyone at Endo about what he observed in Wijetilaka's office.

33.      While the above charges did not involve Opana ER, and the OAG did not charge that promotion by Endo played a role in cases it prosecuted, in certain limited circumstances it may have been possible for Endo sales representatives to recognize a potential sign of diversion that should have been reported per Endo's policy and could have resulted in the sales representative stopping detailing that HCP sooner.

**D.   Limitations in HCPs' Knowledge of Appropriate Prescribing Practices**

34.      A recently published survey showed that many primary care physicians do not understand basic facts about how people may abuse opioids or how addictive opioids can be. Nearly half of the internists, family physicians and general practitioners surveyed incorrectly thought that "abuse-deterrent" pills were less addictive than their standard counterparts.[13] One-third of the HCPs erroneously said they believed that most prescription drug abuse is by means other than swallowing the pills as intended.  As noted above, oral ingestion is the most common route by which opioids are abused.

**E.   Opioid Patients' Need For Information Regarding Addiction Treatment**

35.      Patients undergoing opioid therapy need information about the risks of addiction and the availability of addiction treatment resources.  Recent studies have indicated that opioid

---

[13] *See* Catherine S. Hwang et al., *Primary Care Physicians' Knowledge And Attitudes Regarding Prescription Opioid Abuse and Diversion*, Clinical J. of Pain (Jun. 22, 2015).

use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder.[14]   A study published in 2015, based on computer-assisted review of electronic health records, concluded that 13.5% of patients receiving chronic opioid therapy had either problem opioid use or a diagnosis for opioid abuse or dependence.[15] Although there is presently no consensus regarding the incidence or prevalence of abuse or addiction to opioids among patients treated with chronic opioid therapy, the above-mentioned studies suggest that efforts to reduce opioid abuse and overdose deaths should address not only those who abuse opioids such as Opana ER without a prescription, but also those who take the medication as prescribed, yet begin to abuse opioids or become addicted to them.

## III.   **RELEVANT LAW**

36.    The New York General Business Law prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York State.  N.Y. Gen. Bus. Law § 349.

37.    The New York General Business Law also prohibits "false advertising in the conduct of any business," N.Y. Gen. Bus. Law § 350, such that the advertising is misleading in a material respect. Whether an advertisement is materially misleading depends on "the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity to which the advertising relates under the conditions prescribed in said advertisement."  N.Y. Gen. Bus. Law § 350-a.

---

[14] *See* Joseph A. Boscarino et al., *Risk Factors For Drug Dependence Among Out-Patients On Opioid Therapy In A Large US Health-Care System*, 105 Addiction 1776 (2010); Joseph A. Boscarino et al., *Prevalence of prescription opioid-use disorder among chronic pain patients: comparison of the DSM-5 versus DSM-4 diagnostic criteria*, 30 J. Addictive Diseases 185 (2011).
[15] *See* Roy E. Palmer et al., *The Prevalence Of Problem Opioid Use In Patients Receiving Chronic Opioid Therapy: Computer Assisted Review Of Electronic Health Record Clinical Notes*, 156 Pain 1208 (2015).

38.     The New York Executive Law prohibits "illegal or fraudulent acts" in the conduct of any business, trade or commerce, and allows the OAG to institute a special proceeding for restitution, damages, and/or injunctive relief against any party which has committed such acts. N.Y. Exec. Law § 63(12).

39.     The OAG concludes that certain Endo marketing practices, statements and omissions violated the above-referenced provisions.

40.     The OAG concludes that Endo's unlawful acts in violation of General Business Law §§ 349 and 350 constitute violations of New York Executive Law § 63(12).

**NOW, WHEREAS,** Endo neither admits nor denies the Attorney General's findings in Paragraphs 11 through 35 above; and

**WHEREAS,** New York laws prohibiting deceptive business practices, and false and misleading advertising, and off-label marketing of prescription drugs  confer important consumer and public health protections; and

**WHEREAS,** Endo has cooperated with the OAG's investigation; and

**WHEREAS,** the Attorney General is willing to accept the terms of this Assurance under Executive Law Section 63(15) and to discontinue his investigation; and

**WHEREAS,** the parties each believe that the obligations imposed by this Assurance are prudent and appropriate; and

**WHEREAS,** the Attorney General has determined that this Assurance is in the public interest.

**IT IS HEREBY UNDERSTOOD AND AGREED,** by and between the parties that:

## IV.   PROSPECTIVE RELIEF

### A.  Truthful Statements Regarding Addiction Risk And Crush Resistance

41.     In the promotion and marketing of Opana ER, Endo shall maintain its policies prohibiting any written or oral claim that is false, misleading or deceptive.  In particular, Endo shall not:

     a.  make statements that Opana ER or opioids generally are non-addictive.

     b.  make statements that most patients who take opioids do not become addicted, unless such statements are supported by competent and reliable evidence.  If Endo believes that such evidence exists, it shall provide such evidence to the OAG at the time of initial dissemination of the statement, along with a copy of such statement.

     c.  make statements describing what most HCPs believe, unless such statements are supported by competent and reliable evidence.  If Endo believes that such evidence exists, it shall provide such evidence to the OAG at the time of initial dissemination of the statement, along with a copy of such statement.

     d.  make statements that Reformulated Opana ER is, is designed to be, or is crush resistant, unless such statements are supported by the FDA-approved product labeling.

     e.  use the term "pseudoaddiction" in any training or marketing.

B. **Truthful Disclosures Regarding Studies**

42.     Endo shall make available on its website truthful and balanced summaries of the results of all Endo-Sponsored Studies,[16] including studies regarding the purported tamper-resistant features of Reformulated Opana ER.  These summaries shall take the form of a publication reference or link to a journal article, for published studies; a link to the relevant clinicaltrials.gov study record; or a copy of the clinical study report synopsis.  Studies that are considered to be "Phase 1,"[17] if they do not concern the purported tamper-resistant features of Reformulated Opana ER, shall not be subject to the requirements of this Paragraph.  Endo may redact from the summaries required by this paragraph (i) personal identification information; (ii) trade secret and confidential commercial information; and (iii) information that may provide a road map for defeating a product's abuse deterrent properties.  Endo shall have a reasonable basis for any such redactions.  Upon request, Endo shall provide the OAG and HCPs with un-redacted study summaries.

43.     Endo shall (a) comply with the current version of the Academy of Managed Care Pharmacy Format for Formulary Submissions; and also (b) provide truthful and balanced summaries of the results of all Endo-Sponsored Studies regarding the purported tamper-resistant features of Reformulated Opana ER, in documents it provides to managed care companies summarizing its clinical research, such as Managed Care Dossiers.  Studies that are considered to be Phase 1, if they do not concern the purported tamper-resistant features of Reformulated Opana

---

[16] The term "Endo Sponsored Studies" means pre-marketing clinical research and post-marketing clinical research that Endo "takes responsibility for and initiates" as "sponsor," as "sponsor" is defined in 21 C.F.R. § 312.3(b), and that involves an intervention with human subjects with an Opioid Medication.  "Opioid Medications" as used in this Assurance means Opana ER and any other FDA-approved prescription drug that contains an opioid as an active pharmaceutical ingredient and is distributed by Endo within the United States.

[17] "Phase 1" shall mean, as defined in FDA regulations, studies concerning "the initial introduction of an investigational new drug into humans. . . . and . . . designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence on effectiveness." 21 C.F.R. § 312.21(a)(1).

ER, shall not be subject to the requirements of this Paragraph. Endo may redact from the summaries required by this paragraph (i) personal identification information; (ii) trade secret and confidential commercial information; and (iii) information that may provide a road map for defeating a product's abuse deterrent properties. Endo shall have a reasonable basis for any such redactions. Upon request, Endo shall provide the OAG and HCPs with un-redacted study summaries.

44.     Endo shall comply with federal regulations regarding the registration of Endo-Sponsored Studies on the National Institutes of Health (NIH)-sponsored website (www.clinicaltrials.gov).

45.     Endo shall continue its good faith efforts to publish information about the results of Endo-Sponsored Studies, not including Phase 1 studies, in peer-reviewed journals.

46.     Endo shall maintain its policy of requiring all authors of articles about Endo-Sponsored Studies to disclose any Endo financial support for the study and any financial relationship with Endo (including any financial interest the author may have in Endo or an Endo product). Endo shall continue to require that an individual may be considered an "author" on a publication about Endo-Sponsored Studies only if the individual has made substantial contributions to the study and has given final approval to the version of the publication ultimately published. Endo shall maintain its policies and procedures that prohibit guest/honorary/gift authorship, ghostwriting, and plagiarism.

C. **Establishment Of Abuse And Diversion Detection Program**

47.     Endo shall maintain and enhance its program consisting of internal procedures designed to identify potential abuse, diversion, or inappropriate prescribing of opioids (such enhanced program shall be referred to herein as the "ADD Program"), as set forth below. The

ADD Program shall remain in place for as long as Endo promotes Opioid Medications to HCPs through its sales representatives. Endo may seek modification of the ADD Program by sending a written request for modification to the OAG. The OAG shall give such petition reasonable consideration and shall respond to Endo within 30 days of receiving such request, but need not grant any such request.

48.     The ADD Program shall apply to Endo sales representatives and medical liaisons who contact HCPs for the purpose of promoting Opioid Medications ("Endo Covered Persons"). The Program shall require those persons to file a written report (an "ADD Report") with Endo's Legal Department when they observe or learn of situations that may suggest that an HCP whom they contact for the purpose of promoting Opioid Medications may be involved in the abuse or diversion of opioids. Nothing in this paragraph shall be read as requiring Endo Covered Persons to perform tasks outside their regular duties. The ADD program shall specify that such facts may include but are not limited to the following examples:

a.   An apparent pattern of an excessive number of patients for the practice type. For example: on a consistent basis, a long line of patients waiting to get prescriptions; a waiting room filled to capacity or standing room only; or patient contact with an HCP that is exceedingly brief or non-existent.

b.   A pattern of prescribing outside the HCP office or after HCP office hours.

c.   Information from a credible source or several sources (*e.g.*, pharmacists, law enforcement, or others) that an HCP or his/her patients are diverting medication.

d.   An HCP who has a disproportionate number of patients who pay cash for office visits and dispensed medication.

e.  An HCP with a sudden unexplained change in prescribing or dispensing patterns that are not accounted for by changes in patient numbers or the practice type.

f.  A credible allegation that a HCP, staff or patient has abused or is actively abusing opioids.

g.  An HCP's practice where unauthorized individuals are signing prescriptions or dispensing controlled substances.

h.  An HCP's practice with large numbers of patients who travel significant distances, for example across state lines, to obtain and/or fill their prescriptions without a rational explanation.

i.  An HCP's practice where there are reports that patients make frequent early requests for new prescriptions significantly in advance of the time the initial prescription would normally have been completed.

j.  A credible allegation that an HCP is under active investigation related to diversion or substance abuse by any law enforcement or regulatory authority.

k.  An HCP who moves his or her practice from one state to another on more than one occasion within a couple of years without rational explanation.

l.  Facts that suggest that patients are seeking opioids for misuse and abuse, including but not limited to facts that suggest that an HCP has failed to comply with New York's Internet System for Tracking Over-Prescribing (I-STOP), which is New York's Prescription Drug Monitoring Program.

m.  Drugs and doses being prescribed are not individualized.

n.  Lack of qualified office staff, such as registered nurses or nurse practitioners.

o.  Special entrance requirements to the practice and/or lack of signage.

p.  Large distances between the doctor, patients and pharmacy.

q.  A high frequency of prescriptions to replace lost prescriptions or medications.

r.  A managed care organization excluded the HCP from writing prescriptions.

s.  Law enforcement presence in or around the office.

t.  HCP personally informs an Endo Covered Person that the HCP is no longer able to prescribe scheduled products.

49.   The ADD Program shall contain the following elements:

a.  When an ADD Report of potential abuse, diversion, or inappropriate prescribing of opioids involving an HCP with whom Endo Covered Persons interact is filed, Endo's Legal Department shall conduct an internal inquiry which shall include but not be limited to a review of the HCP's prescribing history and relevant facts about the HCP's practice.  Endo shall then take such further steps as may be appropriate based on the facts and circumstances.  Such further steps, if warranted by the facts and circumstances, shall include ceasing to promote Opioid Medications to the particular HCP or providing further education to the HCP about appropriate use of opioids.

b.  When an ADD Report is filed about an individual HCP, the sales representative who filed that ADD Report shall immediately cease promoting Opioid Medications to that HCP, and Endo shall, as soon as practicable and in all events no later than ten (10) business days after the filing of such Report, place such HCP on an exclusion list (the "No-Call List").  Endo shall resume promoting Opioid Medications to an HCP placed on the No-Call List only after Endo's Legal Department *in writing* reasonably concludes, based on available information, that

it is appropriate to resume sales calls on that HCP.  The HCP may then be removed from the No-Call List.  If, after conducting its investigation, Endo's Legal Department determines that the HCP about whom an ADD Report has been filed should not thereafter be contacted for purposes of promoting Opioid Medications, that HCP shall remain on the No-Call List.

c.  Endo shall implement and maintain a training and education program with respect to the ADD Program, which training shall cover the details of the ADD Program, and shall require all Endo Covered Persons to complete the training and education program no later than four (4) months after the Effective Date of this Assurance, and to complete the training each calendar year thereafter.

d.  Prior to each call on an HCP, Endo Covered Persons shall check whether that HCP is on the No-Call List.  If an Endo Covered Person promotes Opioid Medications to an HCP on the No-Call List, that individual shall be subject to review for potential disciplinary action, including but not limited to censure, probation and termination.

e.  Endo may resume promoting Opioid Medications to an HCP about whom an ADD Report has been filed only after its Legal Department *in writing* reasonably concludes, based on available information, that it is appropriate to resume sales calls on that HCP.

f.  Endo shall implement additional measures to identify HCPs who should be reviewed for potential placement on the No-Call List, including but not limited to reviewing, on a quarterly basis: (i) news media stories addressing the potential abuse, diversion, or inappropriate prescribing of opioids and/or the governmental

21

investigation and/or arrest of HCPs to whom Endo has promoted Opioid
Medications; and (ii) data sources, such as HCPs' prescription history.

g.  Endo's performance evaluations of Endo Covered Persons shall meaningfully
take into account that sales representatives inform HCPs to whom the sales
representatives promote Opioid Medications about their potential for abuse and
diversion, and how to minimize those risks.  No sales incentive (bonus) program
for sales of Opioid Medications shall allow incentive credit to be earned for
prescriptions by an HCP written after that HCP has been placed on the No-Call
List.

h.  If an Endo Covered Person fails to file an ADD Report regarding an HCP and
Endo determines that that person knew or should have known that an HCP was
engaged in conduct that should have been reported, that person shall be subject to
disciplinary action by Endo, including but not limited to censure, probation and
termination.

50.     Endo Covered Persons in New York shall maintain records of sales calls to HCPs,
and the Endo compliance department, in connection with Endo's Legal Department, shall, on at
least a quarterly basis, audit and review a sample of such records to, *inter alia*, evaluate
compliance with the ADD Program and determine whether ADD Reports need to be filed
regarding particular HCPs.  In creating such records of sales calls, Endo Covered Persons shall
note topics related to their discussions with HCPs, which topics shall be drawn from a list
provided by Endo, which topics shall include but not be limited to: (i) "facts suggesting potential
abuse or diversion of opioids;" and (ii) "training regarding the appropriate prescribing of
opioids."

51.     Endo shall not employ a compensation structure for Endo Covered Persons in which more than 30% of the individual's total compensation (including bonus) is based on the volume of Opana ER prescriptions.

**D.  HCP Training**

52.     Endo Covered Persons shall, within four (4) months of the Effective Date and at the first visit each year thereafter, orally inform each New York HCP to whom Endo promotes Opioid Medications of the availability of training regarding the appropriate prescribing of opioids, the content of which is compliant with the FDA's Risk Evaluation and Mitigation Strategy ("REMS") for Extended Release/Long-Acting Opioids, and shall provide to HCPs written information about such training, in the form of the document set forth as Exhibit A.

**E.  Information About Treatment Resources**

53.     Endo shall make available and provide upon request, written information regarding the New York State HOPEline maintained by the Office of Alcoholism and Substance Abuse Services, to New York HCPs to whom it markets or promotes Opioid Medications.  The HOPEline is a free, confidential number that provides general information regarding addiction treatment resources.  The information described in this Paragraph shall be provided to Endo by the OAG, and is set forth as Exhibit B.

**V.      PENALTIES, FEES AND/OR COSTS**

54.     Within 30 days of the Effective Date, Endo shall pay $200,000.00 (two hundred thousand dollars) to the OAG for penalties, fees and/or costs of the OAG's investigation.  Such sum shall be payable by check to "State of New York Department of Law."

23

## VI.    <u>LIQUIDATED DAMAGES</u>

55.     If Endo violates any material provision of this Assurance, the OAG may elect to demand that Endo pay liquidated damages of $1,000 per episode of non-compliance.  Before liquidated damages may be imposed, the OAG shall give Endo written notice that Endo may be subject to liquidated damages under this Paragraph.  In the event that Endo does not cure the violation or provide the requested information within thirty (30) days of receipt of the OAG's written notice, the OAG may impose liquidated damages pursuant to this Paragraph.  The damages period shall commence on the next business day after the period to cure has lapsed.

## VII.   <u>COMPLIANCE</u>

56.     Within four (4) months of the Effective Date, Endo shall submit a detailed letter, along with supporting documentation, certifying its compliance with Paragraphs 41 through 54 of this Assurance.  Endo shall then, on an annual basis for three years, certify in writing its continuing compliance with the provisions of this Assurance.

57.     <u>Internal Compliance Monitor</u>: to evaluate the ADD Program, Endo shall appoint an Internal Compliance Monitor (the "Monitor"), who shall have the following duties:

    a.  Each year after the Effective Date, the Monitor shall provide the OAG with a written report (the "Monitor's Report") evaluating Endo's implementation of the ADD Program.  The first Monitor's Report shall be due one (1) year after the Effective Date.

    b.  In compiling each Monitor's Report, the Monitor shall review information about Endo's implementation of the ADD Program, including but not limited to the following:

        i.  Training materials and sessions provided to Endo Covered Persons.

24

    ii.  ADD Reports filed by Endo Covered Persons.

    iii.  The final determination regarding each ADD Report and the reasonableness of Endo's determination regarding each Report.

    iv.  Endo's implementation of additional measures to identify HCPs who should be reviewed for potential placement on the No-Call List.

    v.  The evaluation by Endo's compliance department of Endo Covered Persons' records of sales calls.

    vi.  Endo's compensation structure for Endo Covered Persons.

c.  In the Monitor's Reports, the Monitor shall evaluate Endo's compliance with Section IV.C. above and the reasonableness of Endo's decisions regarding whether to continue marketing or promoting Opioid Medications to the HCP identified in each ADD Report.

d.  If, after the third Monitor's Report, the Monitor has concluded that Endo has complied with Section IV.C. above and has made reasonable determinations regarding whether to continue marketing or promoting Opioid Medications to HCPs about whom ADD Reports have been filed, the Monitor shall cease to function.  If the Monitor has, in any of the Monitor's Reports, concluded that Endo has not complied with Section IV.C. above or has not made reasonable determinations regarding whether to continue marketing or promoting Opioid Medications to HCPs about whom ADD Report has been filed, it shall continue to function until such time as it concludes in a subsequent Monitor's Report that Endo is in compliance and has made reasonable determinations.

## VIII.  **GENERAL PROVISIONS**

58.     Endo's Representations: The OAG has agreed to the terms of this Assurance

based on, among other things, the representations made to the OAG by Endo and its counsel and

the OAG's own factual investigation as set forth in the above Findings.  To the extent that any

material representations are later found to be inaccurate or misleading, this Assurance is voidable

by the OAG in its sole discretion.

59.     Communications: All communications, reports, correspondence, and payments

that Endo submits to the OAG concerning this Assurance or any related issues is to be sent to the

attention of the person identified below:

> Michael Reisman, Esq.
> Assistant Attorney General
> Health Care Bureau
> Office of the New York State Attorney General
> 120 Broadway
> New York, New York 10271

60.     Receipt by the OAG of materials referenced in this Assurance, with or without

comment, shall not be deemed or construed as approval by the OAG of any of the materials, and

Endo shall not make any representations to the contrary.

61.     All notices, correspondence, and requests to Endo shall be directed as follows:

> Jonathan L. Stern
> Arnold & Porter LLP
> 601 Massachusetts Ave., NW
> Washington, DC 20001-3743

> Joshua M. Davis
> Arnold & Porter LLP
> 601 Massachusetts Ave., NW
> Washington, DC 20001-3743

62.   <u>Valid Grounds and Waiver:</u> Endo hereby accepts the terms and conditions of this Assurance and waives any rights to challenge it in a proceeding under Article 78 of the Civil Practice Law and Rules or in any other action or proceeding.

63.   <u>No Deprivation of the Public's Rights:</u> Nothing herein shall be construed to deprive any member or other person or entity of any private right under law or equity.

64.   <u>No Blanket Approval by the Attorney General of Endo's Practices:</u> Acceptance of this Assurance by the OAG shall not be deemed or construed as approval by the OAG of any of Endo's acts or practices, or those of its agents or assigns, and none of them shall make any representation to the contrary.

65.   <u>Monitoring by the OAG:</u> To the extent not already provided under this Assurance, Endo shall, upon request by the OAG, provide all documentation and information necessary for the OAG to verify compliance with this Assurance.[18]  Endo may request an extension of particular deadlines under this Assurance, but OAG need not grant any such request.  This Assurance does not in any way limit the OAG's right to obtain, by subpoena or by any other means permitted by law, documents, testimony, or other information.

66.   <u>No Limitation on the Attorney General's Authority:</u> Nothing in this Assurance in any way limits the OAG's ability to investigate or take other action with respect to any non-compliance at any time by Endo with respect to this Assurance, or Endo's noncompliance with any applicable law with respect to any matters that are not part of the Covered Conduct.

---

[18] If Endo believes that documentation or information requested by the OAG pursuant to this Paragraph is protected by a privilege or other legal doctrine, and seeks to withhold such documentation or information, it shall provide a statement in writing under oath, stating: (a) the type of documentation or information withheld; (b) the date of documentation or information withheld; (c) the author and recipient of the documentation or information withheld; (d) the general subject matter of the documentation or information withheld; and (e) the legal ground for withholding the documentation or information.  The OAG shall have the right to challenge any such withholding of documentation or information.

67.     No Undercutting of Assurance: Endo shall not take any action or make any statement denying, directly or indirectly, the propriety of this Assurance or expressing the view that this Assurance is without factual basis.  Nothing in this paragraph affects Endo's testimonial obligations, or right to take legal or factual positions in defense of litigation or other legal proceedings to which the OAG is not a party.  This Assurance is not intended for use by any third party in any other proceeding and is not intended, and should not be construed, as an admission by Endo of any liability or finding set forth herein.

68.     This Assurance shall be governed by the laws of the State of New York without regard to any conflict of laws principles.

69.     If a court of competent jurisdiction determines that Endo has breached this Assurance, Endo shall pay to the OAG the cost, if any, of such determination and of enforcing this Assurance, including, without limitation, legal fees, expenses, and court costs.

70.     None of the parties shall be considered to be the drafter of this Assurance or any provision for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter hereof.  This Assurance was drafted with substantial input by all parties and their counsel, and no reliance was placed on any representation other than those contained in this Assurance.

71.     In the event that any one or more of the provisions contained in this Assurance shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

72.     No representation, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied upon by Endo in agreeing to this Assurance.

73.     This Assurance contains an entire, complete, and integrated statement of each and every term and provision agreed to by and among the parties, and the Assurance is not subject to any condition not provided for herein.  This Assurance supersedes any prior agreements or understandings, whether written or oral, between and among the OAG and Endo regarding the subject matter of this Assurance.

74.     This Assurance may not be amended or modified except in an instrument in writing signed on behalf of all the parties to this Assurance.

75.     The division of this Assurance into sections and subsections and the use of captions and headings in connection herewith are solely for convenience and shall have no legal effect in construing the provisions of this Assurance.

76.     <u>Binding Effect:</u> This Assurance is binding on and inures to the benefit of the parties to this Assurance and their respective successors and assigns, provided that no party, other than the OAG, may assign, delegate, or otherwise transfer any of its rights or obligations under this Assurance without prior written consent of the OAG.

77.     <u>Effective Date:</u> This Assurance is effective on the date that it is signed by the Attorney General or his authorized representative (the "Effective Date"), and the document may be executed in counterparts, which shall all be deemed an original for all purposes.

**AGREED TO BY THE PARTIES:**

Dated: _____, 2016

                                        **ENDO HEALTH SOLUTIONS INC.**
                                        **ENDO PHARMACEUTICALS INC.**

                                        By: _____
                                            RAJIV DE SILVA, CEO

Dated: March 1, 2016

                                        **ERIC T. SCHNEIDERMAN**
                                        Attorney General of the State of New York

                                        LISA LANDAU
                                        Chief, Health Care Bureau

                                        By: _____
                                            Michael Reisman,
                                            Assistant Attorney General

                                        By: _____
                                            Carol Hunt,
                                            Assistant Attorney General

# EXHIBIT A

## ER/LA Opioid Analgesics REMS

The Extended Release and Long-Acting (ER/LA) Opioid Analgesics
Risk Evaluation and Mitigation Strategy (REMS)

**CE Credits Available**

## REMS-Compliant Prescriber Training

In 2007, Congress granted the FDA the authority to require manufacturers of medicinal products to implement a Risk Evaluation and Mitigation Strategy (REMS) if the FDA determines a REMS is necessary to ensure that a drug's benefits outweigh its risks. A REMS is a safety strategy required by the FDA from manufacturers to manage a known or potential serious risk associated with a medication and to enable patients to have continued access to such medications by managing their safe use.

FDA has required a shared REMS for all extended-release (ER) and long-acting (LA) opioid medications called the "ER/LA Opioid Analgesics REMS".

If you prescribe ER/LA opioid analgesics, FDA strongly encourages you to complete a REMS-compliant continuing education (CE) program that provides updated training on the risks and safe use of ER/LA opioids. Numerous CE activities that meet REMS standards (also known as "REMS-compliant CE") are currently available in both live and online formats. These activities are offered by accredited providers of CE at nominal or no cost to you. A listing of the ER/LA Opioid Analgesics REMS-compliant CE activities supported by the REMS Program Companies (RPC), a consortium of ER/LA opioid companies, can be found at: https://search.er-la-opioidrems.com/.

Providers of REMS-compliant CE adhere strictly to the accreditation standards of the Accreditation Council for Continuing Medical Education® (ACCME) or other CE accrediting bodies.

The REMS also includes a one-page document that prescribers can use to counsel patients on the risks and safe use of ER/LA opioid analgesics. This patient counseling document can be accessed at:
http://www.er-la-opioidrems.com/IwgUI/rems/pcd.action

Additional information/resources may be found at http://www.er-la-opioidrems.com.

# EXHIBIT B

# Drugs, Alcohol, Gambling

HOPE / HELP

## Call or Text

# 1-877-8-HOPENY

1-877-846-7369

*Text:* HOPENY (467369)

## *There is hope and help.*

- All calls and texts are free and confidential
- 24 hours a day, 7 days a week
- Information and referrals from masters-level clinicians



**NEW YORK STATE** | **Office of Alcoholism and Substance Abuse Services**

**Addiction Services for Prevention, Treatment, Recovery**

www.oasas.ny.gov